PEOPLES STATE BANK OF CLAY
COUNTY, Appellant
(Intervenor below),

v.

Jane A. THOMPSON d/b/a Adams
Farms, Appellee (Plaintiff below),

and

Swing Wing, Inc. and Frank Fritts and
Michael Fritts d/b/a Fritts Farms,
Appellees (Defendants below).

No. 1–683A199.

Court of Appeals of Indiana,
First District.

April 25, 1984.

William G. Brown, Brazil, for appellant.

Danford R. Due, Joseph L. Claypool, Indianapolis, Clelland J. Hanner, Rockville, Donald E. Gibson, Veedersburg, Marion Withers, Anderson, for appellees.

ROBERTSON, Judge.

Peoples State Bank of Clay County (Bank) appeals a judgment from the Parke Circuit Court in favor of Jane A. Thompson d/b/a Adams Farms (Adams Farm) and Swing Wing, Inc., and Frank Fritts and Michael Fritts d/b/a Fritts Farms.

We affirm in part and reverse and remand in part.

The Fritts entered into a farm lease agreement with Adams Farm on February 4, 1980. The lease was for a three-year term with total rent of $450,000. The rent was payable in installments of $150,000 per year, $50,000 due by March 1, and $100,000 due on December 15. In February of 1981, Fritts borrowed money from the bank for payment to Adams Farm. The December, 1980, payment had been paid for with a promissory note. The money from the Bank was also used for part of the March, 1981, installment.

On June 18, 1981, Adams Farm filed a notice of intention to hold a lien on crops pursuant to IND.CODE 32–7–1–18. The Bank filed certain U.C.C. filings on June 22, 1981, pursuant to the promissory notes and security agreements executed in February. Swing Wing, a company from which Fritts had bought agricultural products, filed a U.C.C. filing on June 15, 1981. The filing on June 18, by Adams Farm accurately identified the real estate whereas the June 22, filing by the Bank and the June 15, filing by Swing Wing did not. However, the Bank did file additional U.C.C. forms on June 7, 1982, which did specifically designate the Adams Farm.

In November, 1981, Adams Farm became aware of certain lawsuits filed against Fritts and questioned their ability to harvest their crops. On November 10, 1981, Adams Farm filed a complaint seeking termination of the lease agreement and damages. Prior to a hearing by the Parke Circuit Court, Adams Farm got relief from the U.S. Bankruptcy Court, Southern District of Indiana, by having the Fritts' leasehold interest terminated and the automatic stay of the Bankruptcy Court lifted. On August 19, 1982, in the Parke Circuit Court, prior to trial, the parties stipulated to the following facts:

1) The Fritts were indebted to Adams Farm for 1981 rental in the amount of $100,000 interest from December 15, 1981, and attorney's fees.

2) The Fritts were indebted to Swing Wing in the approximate amount of $86,000 with interest thereon, for agricultural products.

3) The Fritts were indebted to the Bank in the amount of $120,000 plus accrued interest, and attorney's fees, as a result of the Fritts' execution of certain promissory notes to the Bank.

4) The Fritts farmed Adams Farm and grew a crop thereon which was harvested and sold after the filing of this lawsuit, and the proceeds being held were $73,573.48 by Adams Farm, $10,-

867.53 by Swing Wing, and the Clerk of the Court in the amount of $53,344.70.

5) That of the amount in the hands of the Clerk of the Court, $10,269.78 represented proceeds from the sale of grain raised by the Fritts on property other than Adams Farm.

6) Adams Farm claims a security interest in the proceeds by its landlord's lien dated June 16, 1981, which was recorded on June 18, 1981.

7) Swing Wing claims a security interest in the proceeds by way of its U.C.C. filing dated June 15, 1981.

8) The Bank claims a security interest in the proceeds by way of its note and security agreements, and U.C.C. filings dated June 22, 1981.

The Parke Circuit Court awarded Adams Farm a judgment of $100,000.00 plus interest at the rate of 8% from December 15, 1981, in the sum of $6,510.48. Adams Farm also received attorney's fees in the sum of $16,000.00. The court awarded Swing Wing $10,867.53, with any interest which may have accumulated, as property upon which they perfected a secured interest when they came into possession of collateral pursuant to IND.CODE 26-1-9-305. The court further found that Swing Wing had failed to perfect its security interest prior to coming into possession of collateral in that it failed to properly describe the real estate. The remaining money in the possession of the Clerk together with any interest must be paid to the Bank pursuant to a lien upon said crops on June 7, 1982, which was inferior to the Adams Farm lien, but superior to Swing Wing's lien.

The Bank presents the following issues for review:

1. Whether the landlord's lien has priority over the security interest of the Bank.

2. Whether the landlord's lien is limited to one-half the crop.

3. Whether the award of attorney's fees was so excessive as to be contrary to law.

The first issue is whether the landlord's lien of Adams Farm has priority over the Bank's security interest. IND.CODE 32-7-1-18 provides as follows:

> In all cases where a tenant agrees to pay as rent, a part of the crop raised on the leased premises, or rent in kind, or a cash rent, the landlord may have a lien on the crop raised under such contract, for the payment of such rent, which lien, if the tenant refuses or neglects to pay or deliver to the landlord such rent when due, may be enforced by sale of such crop, in the same manner the lien of a chattel mortgage containing a power to sell. Any landlord desiring to acquire a lien on the crop raised under such contract, on such leased premises, shall file in the recorder's office of the county in which such leased premises is located, at any time thirty (30) days prior to the maturity of such crop, and during the year in which such crop is grown, notice of his intention to hold a lien upon such crop *for the amount of such rent,* specifically setting forth the amount claimed, and giving a substantial description of the lands on which such crop is being grown, sufficiently precise to identify such lands. The recorder shall record the notice, when presented, in the miscellaneous record book, for which he shall receive twenty-five (25 cents), and *all liens so created shall relate to the time of recording* and shall have *priority over all liens suffered or created thereafter*: Provided, That nothing herein contained shall prohibit the tenant, after notice in writing to the landlord or his agent from removing from such leased premises his own part of said growing crop, and no more than such part, and from also disposing of the same whenever the rent is to be paid in part of the crop raised, and in other cases he may remove not more than one-half of the crop growing or matured. (Emphasis added).

This statute provides that a landlord may have a lien on crops raised on the leased premises for the value of the agreed to rent. According to the lease agreement,

Adams Farm was to receive cash rent from Fritts for the real estate. On June 18, 1981, Adams Farm filed its crop lien according to the above statute with the Parke County Recorder.

There is no question that the Bank as well as Adams Farm held a valid security interest in the crops grown on the rented real estate. The question is which one has priority. The provisions of IND.CODE 26-1-9-104 specifically excludes landlord's liens from coverage by Article IV of the Uniform Commercial Code. Some jurisdictions hold that in cases such as this, priority between a statutory lien and a U.C.C. security interest must be determined by pre-code law. Thus, where there existed a preference for either the statutory lien or the security interest, courts have held that such preference still exists.[1]

Under pre-code Indiana law, any claim of a security interest in crops would have been covered by the Chattel Mortgage Act. Relevant parts of the Act state as follows:

> 51-502. "Personal property" defined—Liens created-Priorities-Landlords-Releases of share rights.—
>
> All such property shall be deemed to be personal property for mortgage purposes and validly mortgageable as such. The term "agricultural products", as used in this act, included [includes] horticultural, viticultural, forestry, nut, dairy, live stock, bee and any and all farm products unless the context or subject-matter requires otherwise. Such mortgage shall be a good and valid lien upon the property therein described and thereby conveyed, which herein, shall be a good and valid lien against, and superior to all rights of any and all unsecured creditors of the mortgagor, and any and all subsequent purchasers, mortgagees, lienors and encumbrancers, including judgment creditors, of the mortgagor, and any and all third persons, excepting that the land-lord's lien as now provided by law shall be superior to all other liens unless the same is released, waived or subordinated....
>
> 51-504 Mortgage lien-Priority-Effect of Failure to record—
>
> The lien of any chattel mortgage which has been executed and filed in accordance with the terms and provisions of this Act shall be entitled to priority in all respects over any mortgage lien, or encumbrances which has not been filed ...
>
> Burns Indiana Statutes §§ 51-501 et seq. Repealed by Acts 1963, ch. 317, §§ 10-102.

Clearly, 51-502 has a preference in favor of the landlord's lien. Also, 51-504 requires the chattel mortgagee's lien to be executed and filed, prior to the filing of competing liens, in order to take priority. In this case, the landlord's notice of intention to hold a lien on crops pursuant to I.C. 32-7-1-18 was filed on June 18, 1981. The Bank executed two promissory notes, disclosure, and security agreements in favor of Fritts on February 23, 1981. The Bank contends that its lien was created on that date and consequently, takes priority over the landlord's lien. However, it is undisputed that the Bank did not file its security interest with the Parke County Recorder until June 22, 1981. Since the landlord's lien had already been recorded on June 18, 1981, it takes priority. Thus, according to pre-code law, the judgment of the trial court is correct.

Other jurisdictions having no pre-code preference have generally held that the first interest to be secured or perfected takes priority.[2] According to IND.CODE 26-1-9-302, perfection is usually accomplished by the filing of a financing statement. Under this rule of law, the landlord's lien would again take priority since

---

1. Annot., 99 A.L.R. 3rd 1006, 1008 (1980).

2. *Id.* at 1010, 1011; *Cf. National Investment Trust v. First National Bank of Albuquerque,* (1975) 88 N.M. 514, 543 P.2d 482 (Secured creditor whose interest under U.C.C. was created and recorded before tenancy began was entitled to priority over statutory landlord's lien, even though landlord's lien attached to lessee's after acquired inventory at the same time as the security interest).

Adams Farm was the first to file with the county recorder.[3]

▮▮▮ Despite exclusion of the landlord's lien from the U.C.C., some jurisdictions have held that the priorities of a U.C.C. security interest and a landlord's lien should be determined under U.C.C. rules. For example, in *Peterson v. Ziegler*, (1976) 39 Ill.App.3d 379, 350 N.E.2d 356, the court held that although Article IX does not apply to landlord's liens, that section only refers to priorities between competing landlord lienholders. I.C. 26–1–9–301 provides that unperfected security interest are subordinate to the rights of a lien creditor who becomes such without the knowledge of the security interest and before it is perfected. We have already determined that Adams Farm became a lien creditor prior to the Bank perfecting its security interest. The question then is whether Adams Farm had any notice of the alleged security interest of the Bank. The Bank contends that Adams Farm knew that its December, 1980, and part of its March, 1981, rent payment came from the Bank. However, the testimony of Mrs. Thompson indicates that Adams Farm had no notice of any interest held by the Bank. It is not our function to reweigh the evidence. Any conflict in evidence should be considered in a light most favorable to the appellees. *Standard Land Corporation of Indiana v. Bogardus, et al*, (1972) 154 Ind.App. 283, 289 N.E.2d 803. Furthermore, the basic purpose of filing under the U.C.C. is to give public notice of the filing. 69 Am.Jur.2d, *Secured Transaction* § 377. The evidence clearly supports the inference of no knowledge on the part of Adams Farm. Accordingly, the U.C.C. also supports the priority of Adams Farm.

We are uncertain as to which rule of law Indiana courts prefer. If there is a preference suggested by prior decisions, we feel that it is a preference toward the first to file taking priority. In this case, Adams Farm clearly has priority regardless of which rule of law is preferred. There is no error in the trial court's decision that the security interest of the Bank was inferior to that of Adams Farm.

▮▮▮ Secondly, the Bank contends that I.C. 32–7–1–18 requires that the landlord's lien be limited to one-half the crop growing on Adams Farm. I.C. 32–7–1–18 reads in pertinent part as follows:

> In all cases where a tenant agrees to pay as rent, a part of the crop raised on the leased premises, or rent in kind, or a cash rent, the landlord may have a lien on the crop raised under such contract, for the payment of such rent, which lien, if the tenant refused or neglects to pay or deliver to the landlord such rent when due, may be enforced by sale of such crop, in the same manner the lien of a chattel mortgage containing a power to sell . . . . [P]rovided, that nothing herein contained shall prohibit the tenant after notice in writing to the landlord or his agent from removing from such leased premises his own part of paid growing crop and no more than such part, and from also disposing of the same whenever the rent is to be paid in part of the crop raised, *and in other cases he may remove not more than one-half of the crop growing or matured.* (Emphasis added).

This statute provides protection of a landlord's contract rights. It specifically states that a landlord may have a lien on the crop raised under a contract, "for the payment of such rent" without limitation. It also calls for notice to be given the landlord by the tenant of the proposed removal of crops which are subject to the lien. An additional restriction upon the tenant in cases where rent is to be paid "in another manner" (referring to other than in part of the crop raised), the tenant may remove no more than one-half of the crop growing or matured. The notice requirement and ref-

---

**3.** There seems to be some question as to whether the Bank's U.C.C. filing on June 22, 1981, set forth a sufficient description of Adams Farm. However, since both the June 22, 1981, and the June 7, 1982, U.C.C. filings were both recorded after the Adams Farm notice of intent to hold a lien on June 18, 1981, it is inconsequential which document contained an adequate description of the property.

erence to one-half of the crop are safeguards for the landlord and in no way restricts the landlord's lien. This interpretation is supported by *Simpson v. Jones,* (1925) 85 Ind.App. 35, 147 N.E. 922.

In *Simpson,* the landlord leased his property to the tenant for rent which was to be partially paid in cash and partially paid in crops. The Court held that the tenant's notice to the landlord of his intention to sell his part of the crops did not release the landlord's lien on the crops for rent. The Court reasoned that the statutory provision of notice is for the protection of the landlord and to prevent clandestine removal of the crops by the tenant. Similarly, in this case, we find no restrictions upon the landlord's lien. I.C. 32–7–1–18 does not require the landlord's lien to be limited to one-half the crop growing on the premises.

■ Lastly, the Bank contends that the award of attorney's fees was so excessive as to be contrary to law and the evidence. Paragraph twelve (12) of the farm lease agreement provides that the lessee shall pay all reasonable attorney's fees and other expenses reasonably incurred by Lessor in enforcing the lease or in recovering possession of the premises. The trial court, therefore, was justified in awarding attorney's fees. The question then presented is whether the amount awarded was in a sum which would be regarded as an abuse of discretion since we can review for only such an abuse. *Streets v. M.G.I.C. Mortgage Corp., et al,* (1978) 177 Ind.App. 184, 378 N.E.2d 915.

The evidence submitted at trial consisted of the following exchange during Jane Thompson's direct examination:

Q. Have you been forced in attempting to collect your rent and to enforce your landlord's lien, to employ attorneys to represent you?

A. Yes.

Q. And have you employed myself and Joe Claypool and Mr. Hanner to do that?

A. Right.

Q. Have you been submitted statements for attorney fees that we have run up in attempting to collecting your rent for you?

A. Yes.

Q. How much attorney fees have you incurred in collecting the rent owing for the 1981 crops?

A. $15,482.57.

Q. Do you believe that this statement is a fair and reasonable sum for the work that has been done endeavoring to collect rent due?

A. Yes.

This constitutes the only evidence at trial as to the amount and reasonableness of the attorney's fees. The law in Indiana is conflicting on the question of whether a court can award attorney's fees without supporting evidence. *U.S. Aircraft Financing, Inc. v. Jankovich,* (1980) Ind.App., 407 N.E.2d 287. It appears that in certain types of cases, particularly divorce or dissolution, it is generally held that evidence is not required to support an award of attorney's fees. This is apparently true when the amount of the fees is relatively modest or appears to be the norm for the type of litigation under consideration. However, where the nature of the action is unique, the Supreme Court has held that lack of evidence is fatal. *Sears, Roebuck and Co. v. State,* (1967) 248 Ind. 169, 225 N.E.2d 175.

Here, there is scant evidence as to the amount, adequacy, or reasonableness of the attorney's fees. Certain objective standards should be employed in making a decision regarding attorney's fees. *See, U.S. Aircraft Financing, Inc. v. Jankovich, supra* at 296. Such factors include: time, labor, skill required to perform the service, difficulty of issues, the fee customarily charged in the locality for similar services, and the amount of money involved as well as those factors set forth in the Code of Professional Responsibility, D.R. 2–106(B). We do not find sufficient evidence before us to make a determination as to whether the trial court abused its discretion. Consequently, we remand this cause to the

trial court for a hearing on the matter of attorney's fees.

Judgment affirmed in part and reversed and remanded with instructions in part.

NEAL, P.J., concurs.

RATLIFF, J., concurs with separate opinion.

RATLIFF, Judge, concurring.

I concur in the majority opinion. However, I wish to make additional comments concerning the matter of attorney's fees.

Our decisions in *Berkemeier v. Rushville National Bank*, (1982) Ind.App., 438 N.E.2d 1054; and *U.S. Aircraft Financing, Inc. v. Jankovich*, (1980) Ind.App., 407 N.E.2d 287, *trans. denied,* have questioned seriously the power of a trial judge to fix attorney's fees based upon his own alleged expertise and have put severe limits upon the exercise of that power. As we said in *Berkemeier*, an action on a promissory note and to foreclose a real estate mortgage and security agreement involving a principal amount in excess of $200,000, "save for routine cases involving relatively small amounts, awards of attorney's fees in cases of this nature must be supported by evidence." 438 N.E.2d at 1058.

Here, the majority says there is scant evidence as to amount, adequacy, or reasonableness of the attorney's fees. In my view, there was no proper evidence before the court on any of those matters. The only evidence here was testimony by the plaintiff that her attorneys had charged her $15,482.57 and that she felt the sum was reasonable. In *Parrish v. Terre Haute Savings Bank*, (1982) Ind.App., 431 N.E.2d 132, *on rehearing* 438 N.E.2d 1, this court clearly held that a client's statement of how much his lawyer charged was insufficient to show the reasonableness of his fees. That *Parrish* was a jury case makes no difference. If evidence is required to support an award of attorney's fees, it makes no difference whether the trier is court or jury. In neither case would the client's testimony of the amount charged by his attorneys suffice.